[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 05-11715

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
September 5, 2008
THOMAS K. KAHN
CLERK

D.C. Docket No. 04-80032-CR-DMM

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

LARRY E. SCHWARTZ,
RAPHAEL RAYMOND LEVY,
a.k.a. R. Ray Levy,
EDWARD MEYER,
RONALEE LEVY ORLICK,

Defendants-Appellants.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(September 5, 2008)**

Before TJOFLAT, FAY and SILER,[*] Circuit Judges.

TJOFLAT, Circuit Judge.

A Southern District of Florida jury found Larry Schwartz, Edward Meyer, Raphael Raymond Levy, and Ronalee Orlick[1] guilty of offenses they committed in carrying out a fraudulent scheme to sell high-yield promissory notes, issued by companies Schwartz and Levy owned, to individual investors.[2] The scheme had a life of about four years; it came to an end shortly before Schwartz's company filed for bankruptcy. As investors became aware that their notes might become worthless, they demanded payment. Most were too late; the losses they suffered totaled in excess of $30 million.

The district court accepted the jury's verdicts and sentenced the defendants to lengthy prison terms. They now appeal. Schwartz appeals his convictions on the ground that the district court committed a <u>Bruton</u>[3] violation when it permitted

---

[*] Honorable Eugene E. Siler, Jr., United States Circuit Judge for the Sixth Circuit, sitting by designation.

[1] Louis Ratfield, a codefendant, was tried jointly with the others. The jury acquitted him of all charges.

[2] As indicated <u>infra</u> in part I.B., the jury found the defendants guilty of several offenses, including conspiracy to commit mail fraud, conspiracy to commit money laundering, and the substantive offenses that were objects of these conspiracies, e.g., mail fraud and money laundering.

[3] <u>See</u> <u>Bruton v. United States</u>, 391 U.S. 123, 88 S. Ct. 1620, 20 L. Ed. 2d 476 (1968).

the prosecutor to introduce into evidence an out-of-court statement by codefendant Meyer that implicated him in most, if not all, of the charged offenses. Meyer appeals the district court's refusal to dismiss the charges against him on the ground that the Government used statements he made under a grant of immunity to obtain his indictment. Levy and Orlick challenge the sufficiency of the evidence to convict.[4] We consider these individual appeals in the above order, after describing the sale of the high-yield promissory notes, the crimes charged in the indictment, and the case's post-indictment history.

## I.

## A.

1. First Capital Services sells "capital notes" to individual investors to raise money for its factoring business.

Larry Schwartz formed First Capital Services ("FCS") on December 23, 1992. From the beginning, FCS specialized in the purchase of discounted

---

[4] Levy also appeals his sentences on the grounds that the district court's findings of fact at the sentencing hearing that he was an organizer of the criminal activity and that he was accountable for $20 million in money laundering were clearly erroneous, and that the court misapplied the grouping provisions of the Sentencing Guidelines. We find no clear error in the court's findings of fact, or error in its application of the grouping provisions of the Guidelines, and therefore affirm Levy's sentences without further comment.

accounts receivable, or invoices, a financing practice called factoring.[5] Schwartz was FCS's president and one of its two directors.[6]

Edward Meyer started at FCS in October 1994 as a special projects manager. He served as controller from about January 1995 to October 1999. As controller, he maintained the financial books and records of the company, including the general ledger, cash disbursement journal, and accounts payable ledger.

Starting in 1996, FCS sold "senior capital notes" to individual investors to raise money for factoring accounts receivable. FCS sold the notes to investors directly and through outside brokers.

FCS provided the brokers with a tri-fold sales brochure advertising the terms and options for "Capital Funding/Senior Capital Notes." One panel of the brochure titled "Safety and Yield[:] the Capital Note Advantages" provided an

---

[5] A typical factoring deal goes like this. A factor purchases the accounts receivable of a "client." The debtor's payment is then directed to the factor by the due date on the invoice. Typically the factor gives about 70 percent of the invoice's face value up front to the client and keeps 30 percent as a "reserve," as a kind of insurance against default by the debtor (either on this deal or another deal with the same client). When the debtor satisfies the invoice, the factor sends the reserve to the client, minus (1) collection and handling fees, and (2) some agreed rate of return per week or month that the receivable was outstanding after the factor purchased it. The factor's rate of return would typically be about 1 percent of the face value of the invoice for every ten days before the debtor satisfied the invoice, which amounts to 36.5 percent annually.

[6] For a time, Fred Horwin was the other director. By all accounts he was a factoring guru and spearheaded FCS's factoring program while he was with FCS. By 1999, he had parted ways with Schwartz to start his own factoring firm.

overview of the notes.  It stated: "Notes [are] backed by Federal, State or Local Government receivables, and Insured Corporate Receivables."  The next paragraph stated: "All funds are held in a segregated Capital Note Account used only for the purchasing of Government backed and Insured corporate receivables."  This was followed by a bulleted list of the note's attributes: 9.25 annual percentage rate ("APR");[7] 6-month term; fixed principal; fixed interest rate; liquid; monthly interest payments; ownership of receivables by First Capital evidenced by a first lien on a UCC-1 filing; no sales charge; and $25,000 minimum.  There was a footnote linked to "liquid" that stated: "Note may be redeemed by lender prior to maturity date.  Early redemptions will incur a one month interest penalty."

Another panel of the brochure was titled "About First Capital Services."  It stated, among other things, that FCS had been in the "business of financing government backed and insured receivables since 1992, and as of December 1997 has purchased in excess of $225,000,000 in accounts receivable."  It further stated:

> [t]o assure and maintain the highest level of safety of principal, Continental Insurance Company part [sic] of the 65 Billion Dollar CNA/Continental insurance group conducts its own independent due diligence on all receivables and all debtor companies.  FIRST CAPITAL SERVICES, INC. WILL ONLY FINANCE

---

[7] Some notes earned more than 9.25 percent, depending on the amount borrowed as shown on the face of the note.  Also, a note's rate of return often increased by one to three and a half percent upon renewal as an incentive to stay in the program.

<u>RECEIVABLES THAT ARE UNDERWRITTEN AND INSURED BY THE CONTINENTAL INSURANCE COMPANY</u>.  (Government backed receivables are exempt from this requirement.).

(Emphasis in original).

A third panel of the brochure was dedicated to a list of "Debtor Clients," including "Government" entities such as the "Federal Government," "Department of Navy," "Department of Transportation," "State of Florida," "State of Georgia," "City of New York," and "Broward County," and reliable "Corporate" entities such as "Wal-Mart," "3M," "General Electric," "AT&T," "Heinz," and "Florida Power & Light."

Yet another panel urged potential investors that upon "review[ing] this brochure," "[c]ommon sense will tell you this investment is an ideal combination of handsome returns, rock-solid safety, and liquidity."[8]

Upon sending a check to FCS, investors received a "Corporate Funding Note" in the mail that detailed the terms of their investment and reiterated the representations made in the brochure.  In particular, the note stated: "For the sole purposes of purchasing insured corporate receivables or government backed accounts receivable [sic]."  Unlike the brochure, the note referred to the investor

---

[8]  At trial, the Government introduced into evidence at least three different permutations of the capital note brochure.  They were identical except for minor details, such as the value of FCS's factoring business to date.

6

as "lender" and FCS as "borrower." Paragraph four of the note stated that "[t]he terms of this note cannot be changed nor may the note be discharged in whole or in part except by a writing executed by the lender."[9]

## 2. U.S. Capital takes over FCS's individual investor note program and buys FCS corporate notes.

In 1997, the senior capital notes program came under investigation by the Florida Department of Financial Services, subsequently called the Florida Department of Banking and Finance. The Department was concerned that the notes should be registered as securities, and it had several conversations with FCS.

On December 4, 1997, FCS sent a letter to note holders, stating that it was "pleased to announce important changes to the senior capital note program."[10] The letter mentions that an "offering memorandum" explaining the changes would follow; the memorandum never made it to a note holder.

On December 22, 1997, Raphael Raymond Levy formed U.S. Capital Funding, Incorporated ("U.S. Capital"), a Florida corporation. Up to that point,

---

[9] At some point, the note was accompanied by a notice that a Form UCC-1 Financing Statement had been filed, securing a lien in the investor's favor against the accounts receivable purchased by FCS.

[10] Among the changes touted in the letter was that FCS "intends to purchase discounted life insurance policies on an exclusive basis from Ray Levy . . . [and] [t]hese products will continue to be insured" and "intends to fund various assets at generally accepted industry standards providing high yields."

Levy had been selling FCS senior capital notes through his companies – American Benefits Services, Incorporated ("American Benefits"), and Asset Based Management. U.S. Capital was evidently formed for the purpose of enabling FCS to continue the senior capital note program. U.S. Capital would sell its own promissory notes to individual investors and invest the proceeds in FCS "corporate" notes, which were substantially identical to the notes FCS had issued to individual investors, except that FCS issued them only to U.S. Capital. This plan was effectuated as follows.

On December 31, 1997, FCS, through its counsel, sent a letter to the Florida Office of the Comptroller stating that it would stop selling and renewing senior capital notes. Some months later, Schwartz reaffirmed that position to Korinne Harper, a Department investigator, telling her that the existing FCS senior capital notes would mature in July 1998 without renewal.

In February 1998, Levy's daughter, Ronalee Levy Orlick, began managing U.S. Capital's office and at some point she began exercising signatory authority. By early 1999, she was the company's president. Levy remained U.S. Capital's owner and director throughout the course of the charged conspiracies.[11]

---

[11] The Government introduced a copy of U.S. Capital's March 11, 1999 corporate filings listing Orlick as president and Levy as director.

By April 1998, senior capital note holders, without solicitation, began receiving renewal notes issued in the name of U.S. Capital instead of FCS.[12] The renewal notes had the same terms as the original and stated: "The undersigned, U.S. Capital Funding, Incorporated, borrower, hereby promises to pay to the order of [investor]." U.S. Capital also began marketing its own notes, "U.S. Capital notes," to individual investors directly – by placing ads in newspapers – and through independent brokers, often insurance agents, who were given sales brochures substantially identical to those previously used by FCS. Levy assured brokers and investors that the money generated from notes would be used to invest in FCS's factoring program as described on the brochures; he described U.S. Capital as FCS's "exclusive broker." Investors wrote their checks to U.S. Capital, which deposited their money into its account and issued them a promissory note identical to those formerly issued by FCS, except that U.S. Capital was the borrower. Orlick signed most of the notes and accompanying literature explaining the note program.

In 1998, U.S. Capital used the bulk of investor funds raised from its note program to purchase FCS corporate notes, which indicated FCS as the borrower

---

[12] A senior capital note was renewed or "rolled over" automatically unless the investor requested liquidation of the note in writing.

and U.S. Capital as the lender.  The rate of return on those notes was 10% per six months, or 20% annually, and the notes stated that the principal was to be used for government or corporate receivables insured by Continental Insurance.

3.  What FCS did with U.S. Capital's money.

Besides buying accounts receivable, FCS used investor money to make asset based loans.  From 1997 to 1999, FCS made loans totaling $28,774,303, with about $14 million of that in 1998 to 1999, after U.S. Capital was supplying FCS with funds.  From 1997 to 1999, FCS collected a total of $2,307,911 from its asset based loan debtors.  Stephen Kelley, a forensic accountant hired by FCS's attorneys in 2000 to prepare FCS's 1996-2000 tax returns, testified that it was impossible to pinpoint the source of the funds used for any given transaction because FCS "commingled" operating and investor funds.  Based on the percentage of FCS's income represented by U.S. Capital notes and the amount FCS spent on issuing asset based loans, however, such loans "would have had to have been funded through U.S. Capital funds."  The loans were not covered by FCS's accounts receivable insurance.[13]  In addition, FCS entered into transactions

_____

[13]  At least some of the loans were secured by an interest in the debtor's assets.  For example, FCS issued the following loans in 1998: $136,500 to Quality Equestrian Connections, in which Schwartz owned an interest, for the purchase of a horse, secured by horses and equipment; $154,000 to Seahawk Deep Ocean Technology, Inc., apparently for the purchase of a ship, secured by a preferred ship's mortgage; $762,607 to Vanderbilt Square, for the purchase of "The Dry Tortugas Treasure," secured by the treasure itself; $1,027,062 in 1998 to Nick's Italian

for assets that – though perhaps accurately described as accounts receivable – were by nature not insurable and, in fact, were uninsured.[14]

FCS did not carry insurance adequate to cover <u>all</u> of the accounts receivable it did purchase. FCS's Continental insurance policy technically covered most of its accounts receivable individually, but it had a $2 million annual ceiling. Further, Continental Insurance, which became CNA Insurance, declined to renew FCS's policy beginning March 24, 1999.[15] Thus, none of the notes set to mature after that date were covered by Continental Insurance.[16]

4. What U.S. Capital did with individual investor funds.

---

Fishery (it is unclear if this loan was secured); and $660,000 to River Ranch American Resorts, Incorporated, a western-themed resort in central Florida, secured by real estate and chattel.

[14] For instance, on June 1, 1998, FCS bought the receivables of Kaye Kotts & Associates, a consulting firm, for $200,000. The receivables were in the form of post-dated checks from Kaye Kotts' clients, many of whom were not credit-worthy, and many of whom defaulted on their checks. Also in 1998, FCS entered into an unusual transaction with South Mountain, a North Carolina resort membership club. The transaction could be described as the purchase of accounts receivable – future membership dues – that, besides being "secured" by the membership dues owed by resort members over the course of five years, were also secured by liens against resort chattel and a mortgage on 15 acres of property adjacent to the resort.

[15] Sometime during the course of the alleged conspiracy, Continental Insurance discovered that FCS and U.S. Capital were using its name in its advertisements. On several occasions, Continental demanded that the two companies stop their use of its name because the use was unauthorized and misleading. Continental sent a letter to Schwartz on February 1, 1999, stating that FCS's policy would expire on March 24, 1999 and would not be renewed.

[16] American Credit Indemnity issued a policy to FCS, effective April 1, 1999 to March 31, 2000. Under the policy, the maximum that American Credit would pay to satisfy claims was $1.5 million annually. Like FCS's previous policy with Continental Insurance, the American Credit Indemnity insurance covered only accounts receivable.

11

U.S. Capital commingled investor funds in the same accounts with the funds it used to pay its own commission and the commission of independent brokers. In 1998, U.S. Capital forwarded its note holders' liquidation requests to FCS, which would write a check to U.S. Capital, which in turn would write a check to the investor to satisfy the request. By early 1999, though, U.S. Capital was apparently receiving more in new investor funds than in liquidation requests and therefore started satisfying those requests – as well as paying interest and brokerage commissions – from funds provided by new investors. U.S. Capital then sent the balance of new investor funds minus payouts for liquidation, interest, and commissions to FCS, along with new business transmittals documenting each individual investor's current balance.[17] U.S. Capital usually paid brokers their commission within a week of when U.S. Capital issued the underlying note. The brokers believed their commission was coming from U.S. Capital's profit from the notes program.

5. Things fall apart.

In the spring of 1999, Levy was indicted in the Southern District of Florida for fraudulently operating a viatical program through his company American

---

[17] One of the issues debated by witnesses and counsel at trial was whether U.S. Capital's practice amounted to a "Ponzi scheme" or was merely the ordinary offsetting of its balance with FCS.

Benefits, which operated out of the same office as U.S. Capital.[18]  The indictment was publicly reported, and by all accounts, inspired many senior capital note investors to liquidate their U.S. Capital notes.

U.S. Capital could not satisfy investor interest payments or liquidation requests, and FCS, which had been operating at a loss for years, was unable to marshal the funds.

Also in the spring of 1999, U.S. Capital began putting the funds of its note holders into factoring companies besides FCS.[19]  July 19, 1999, was the last time U.S. Capital forwarded investor money to FCS.  U.S. Capital stopped issuing senior capital notes by the end of July, and FCS sent money to U.S. Capital to satisfy an investor's liquidation request for the final time on September 10, 1999. U.S. Capital made its last payment to an investor on November 24, 1999.

In October 1999, Meyer left FCS and U.S. Capital sued FCS for defaulting

---

[18]  In a viatical settlement, a life insurance policyholder sells the right to benefits under the policy.  The buyer pays the policyholder a discount and gets the full value when the policyholder dies.  The following cases detail Levy's involvement in the scheme mentioned in th text.  See United States v. Levy, 374 F.3d 1023 (11th Cir. 2004), cert. granted, 545 U.S. 1101, 125 S. Ct. 2542, 162 L. Ed. 2d 272 (2005) (judgment vacated and remanded for consideration in light of United States v. Booker, 543 U.S. 220, 125 S. Ct. 738, 160 L. Ed. 2d 621 (2005)); In re Fin. Federated Title & Trust, Inc., 273 B.R. 706, 719 (Bankr. S.D. Fla. 2001) (ordering an equitable lien and constructive trust in favor of a bankruptcy trustee against Levy's homestead), aff'd In re Fin. Federated Title & Trust, Inc., 347 F.3d 880, 882-84 (11th Cir. 2003).

[19]  U.S. Capital sent investor money to companies such as Merchants Capital, Invoice Funding, and Sun Capital Services.

13

on its corporate funding notes.  Orlick resigned from U.S. Capital in November, after signing the last check to an investor.  FCS ultimately filed for Chapter 11 bankruptcy on May 12, 2000.[20]

From February 2, 1998 to July 19, 1999, U.S. Capital bought over $22.9 million in FCS corporate notes.  Over a broader period – January 16, 1998 to September 10, 1999 – FCS returned only $7.2 million to U.S. Capital.[21]  Over the course of the whole program, from when FCS began selling senior capital notes in 1996 to its collapse in 1999, individual investors – many of them elderly people lured into the program by periodic interest payments and the relatively low risk associated with insured and government accounts receivable – lost around $30 million.

B.

On April 27, 2004, a Southern District of Florida grand jury returned a

---

[20]  FCS's Chapter 11 plan of reorganization failed, however, and its case was converted into a Chapter 7 liquidation case.  Alan Goldberg, who had been hired by Schwartz to serve as FCS's Chief Operating Officer in January 2000, developed the failed reorganization plan, and the bankruptcy court appointed him the trustee in FCS's Chapter 7 case.

[21]  On October 29, 1999, Kelly Schaeffer, a receptionist at U.S. Capital, sent a facsimile to Meyer and Schwartz with "Liquidations" in the subject line.  It listed the names of investors who had demanded liquidation, the amounts they were due, the dates on which their note(s) had matured (if they had), and the dates on which those investors had written U.S. Capital requesting liquidation.  The facsimile demanded a total of around $16 million from FCS.

In the course of FCS's liquidation, it filed a proof of claim indicating that FCS owed U.S. Capital $33,501,232.12.  Alan Goldberg, FCS's trustee, testified at trial that U.S. Capital was likely to recover no more than $2.5 million from FCS, "in a perfect world."

superceding 25-count indictment charging Schwartz, Meyer, Levy, and Orlick

with various permutations of fraud and theft for their respective roles in the above

scheme.[22]  The case went to trial on October 19, 2004, and on December 1 the jury

---

[22]  Ratfield was also indicted.  See supra note 1.  The superceding indictment alleged the following.

Count I: all defendants conspired to commit mail fraud (18 U.S.C. § 1341) and interstate transportation of stolen property taken by fraud (18 U.S.C. § 2314), all in violation of 18 U.S.C. § 371, which makes it unlawful for "two or more persons [to] conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy."  18 U.S.C. § 371.

Counts 2-5: Schwartz, Meyer, Levy, and Orlick committed mail fraud in violation of 18 U.S.C. § 1341, which then provided, in pertinent part:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money . . . by means of false or fraudulent pretenses, representations, or promises . . . for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service . . . or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail . . . shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 1341.

Counts 6 and 7: Schwartz, Meyer, Levy, and Orlick variously committed interstate transportation of stolen property in violation of 18 U.S.C. § 2314, which provides:

> Whoever transports, transmits, or transfers in interstate or foreign commerce any . . . securities or money, of the value of $5,000 or more, knowing the same to have been stolen, converted or taken by fraud; or
> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money . . . by means of false or fraudulent pretenses, representations, or promises, transports or causes to be transported . . . in interstate or foreign commerce in the execution or concealment of a scheme or artifice to defraud that person or those persons of money or property having a value of $5,000 or more . . . .

18 U.S.C. § 2314.

15

convicted[23] Schwartz and Levy of conspiracies to commit mail fraud and interstate transportation of stolen property (both under Count 1), and money laundering (Count 8), as well as numerous substantive counts.[24] Meyer was convicted of the conspiracy charges and one count of money laundering.[25] Orlick was convicted of conspiracy to commit mail fraud and interstate transportation of stolen property –

---

Count 8: all defendants conspired to commit money laundering activity in violation of 18 U.S.C. § 1956(h), which prohibits "conspir[ing] to commit any offense defined in this section or section 1957." 18 U.S.C. § 1956(h).

Counts 9-18: defendants variously committed money laundering promotion in violation of 18 U.S.C. § 1956(a)(1)(A)(i), which then prohibited "conduct[ing] or attempt[ing] to conduct . . . a financial transaction which in fact involves the proceeds of specified unlawful activity," while "knowing that the property involved in [the] financial transaction represents the proceeds of some form of unlawful activity," and "(A)(i) with the intent to promote the carrying on of specified unlawful activity." 18 U.S.C. § 1956(a)(1)(A)(i).

Counts 19-24: Schwartz, Levy, Orlick, and Ratfield variously committed money laundering (concealment) in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i), which then prohibited "conduct[ing] or attempt[ing] to conduct . . . a financial transaction which in fact involves the proceeds of specified unlawful activity," while "knowing that the property involved in [the] financial transaction represents the proceeds of some form of unlawful activity," and "(B)(i) knowing that the transaction is designed in whole or in part [] to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity." 18 U.S.C. § 1956(a)(1)(B)(i).

Count 25: Orlick conducted monetary transactions in criminally derived property in violation of 18 U.S.C. § 1957, which prohibits "knowingly engag[ing] or attempt[ing] to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity." 18 U.S.C. § 1957(a).

[23] As we state supra at note 1, the jury found Ratfield not guilty as to all charges.

[24] The jury found Schwartz guilty of Counts 1-11, and 14, and not guilty as to Counts 12, 20, and 22. The jury found Levy guilty as to Counts 1-9, 13, 15-19, 21, and 24, and not guilty as to Count 23.

[25] The jury found Meyer guilty of Counts 1, 8, and 14, and acquitted him as to Counts 2-5 and 7.

16

but not conspiracy to commit money laundering – and numerous substantive counts.[26]

On March 15, 2005, the court sent Schwartz to prison for 210 months,[27] Levy for 235 months,[28] and Meyer for 48 months.[29] Orlick was sentenced on April 28, 2005 to a term of 60 months.[30]

On June 1, 2005,[31] the court conducted a restitution hearing and amended the judgments of Schwartz, Meyer, and Levy to order $32,381,080.62 in restitution. The court amended Orlick's judgment to order $16,894,476.72 in

---

[26] The jury found Orlick guilty of Counts 1-7, 19, 21, and 24-25, and not guilty of Counts 8-9, 13, 15-18, and 23.

[27] Schwartz was sentenced to 60 months' imprisonment as to Counts 1-5, 120 months as to Counts 6-7, and 210 months as to Counts 9-11 and 14, with three-year terms of supervised release, all to be served concurrently.

[28] 60 months as to Counts 1-5, 120 months as to Counts 6-8, and 235 months as to Counts 9, 13, 15-19, 21 and 24, with three-year terms of supervised release, all to be served concurrently with each other and with the sentence previously imposed in Case No. 99-Cr-8125-Hurley (S.D. Fla.).

[29] 48 months as to Counts 1, 8, and 14, with three-year terms of supervised release, all to be served concurrently.

[30] 60 months as to each count, to be served concurrently.

[31] The court delayed its order of restitution pursuant to 18 U.S.C. § 3664(d)(5), which provides:

> If the victim's losses are not ascertainable by the date that is 10 days prior to sentencing, the attorney for the Government or the probation officer shall so inform the court, and the court shall set a date for the final determination of the victim's losses, not to exceed 90 days after sentencing.

restitution. The four codefendants thereafter filed timely notices of appeal.[32]

## II.

The Government introduced into evidence over Schwartz's objections a redacted statement made by codefendant Meyer, who did not testify at trial. Schwartz argues that the statement inculpated him in violation of the Sixth Amendment's Confrontation Clause by implying his guilt without affording him the opportunity to cross-examine the declarant. See Bruton v. United States, 391 U.S. 123, 88 S. Ct. 1620, 20 L. Ed. 2d 476 (1968).[33] Unlike in Bruton, the statement here did not inculpate Schwartz by name. Instead, it named corporations he owned or controlled, which he argues compelled an inference of his guilt. See Gray v. Maryland, 523 U.S. 185, 195, 118 S. Ct. 1151, 1156, 140 L. Ed. 2d 294 (1998) (noting that the "kind of, not the simple fact of, inference"

_____

[32] The four codefendants challenge their convictions on several grounds. The only grounds having merit, that are worthy of discussion, are those dealt with in the succeeding text.

[33] Prior to trial, the Government moved the court in limine to obtain advance rulings on the admissibility of statements made by the defendants to FBI agents and others, including a statement made by Meyer during and in relation to FCS's bankruptcy proceedings. The statements, as proffered, had been redacted in an attempt to avoid Bruton problems. Several of the proffered statements implicated Schwartz. His attorney therefore argued that, even as redacted, the statements implicated his client in violation of the Sixth Amendment and Bruton. Although the transcript of the hearing on the motion in limine is not clear, it appears that the court reserved ruling on the admissibility of the several statements until they were offered into evidence at trial.

At trial, when the Government offered Meyer's statement into evidence, Schwartz's counsel reiterated the objection he had made at the hearing. The court overruled his objection, concluding that the redaction was sufficient to remove Schwartz's identity.

matters). The Government, though, in its closing argument to the jury, linked Schwartz to the affidavit by name. After the Government's argument, Schwartz moved for a mistrial and the court denied the motion.

In evaluating Schwartz's <u>Bruton</u> claim, we examine the whole record to determine whether a reasonable juror was compelled to draw an inference of Schwartz's guilt from the codefendant statements. <u>See</u> <u>Harrington v. California</u>, 395 U.S. 250, 254, 89 S. Ct. 1726, 1728, 23 L. Ed. 2d 284 (1969) ("Our judgment must be based on our own reading of the record and on what seems to us to have been the probable impact of the [codefendant statements] on the minds of an average jury.").

A.

We consider the following in the order it was presented to the jury at trial: the Government's evidence against Schwartz linking him to Meyer's statement; the statement itself; and the Government's closing argument.

1.

The Government called forty-two witnesses in its case in chief, which lasted from October 20 to November 12, 2004. One of the Government's chief goals was to show that FCS, at Schwartz's direction, used investor money to make asset based loans, in spite of its representation to investors that it would use their money

19

strictly to purchase government or insured accounts receivable.

Lee Summers, FCS's first attorney, testified for more than two days about Schwartz's business affairs with FCS and other corporations.[34] Schwartz recruited Summers in 1992 to form FCS, which retained his legal services until 1999.[35] Summers testified to the following.

Schwartz was the president of FCS. Schwartz and a shareholder named Fred Horwin were the only two directors.[36] FCS had early on formed a committee to consider potential investments and make recommendations to the board. Schwartz, however, as CEO and "major shareholder," occasionally funded an investment in spite of the committee's recommendation against it.

During the course of his work for FCS, Schwartz occasionally came upon

---

[34] Summers cooperated with the Government pursuant to a limited use immunity agreement. He was not charged as a codefendant in the indictment. The Government called Summers on October 29, the sixth day the jury heard testimony. Although numerous witnesses had testified to the effect that Schwartz was the president of FCS and to some extent ran the show, Summers was the first to go into detail regarding Schwartz's management of FCS and his other corporations.

[35] Summers was a partner in the firm Mattlin & McClosky when Schwartz asked him to handle the legal formation of FCS in 1992. Besides representing FCS, he represented Schwartz personally in two or three matters. He sold his partnership shares back to Mattlin & McClosky sometime around 1994 and became "general counsel" to FCS. Accordingly, he moved out of Mattlin & McClosky's office and subleased office space from FCS (although FCS paid for the sublease). His office was separated from FCS's office space by a door, which was usually kept closed and sometimes locked. Summers was not technically "in-house" counsel to FCS. Although FCS retained him, he maintained other clients as well.

[36] Horwin left FCS in 1999.

20

business opportunities.  Summers advised him to offer each opportunity to FCS before taking it himself, and testified that Schwartz normally got Horwin's consent before doing so.  On several occasions, Schwartz and Horwin purchased stock they became aware of in the course of acting in their capacity as directors of FCS.[37]

Schwartz owned and operated a company called First Consolidated Financial Corporation ("First Consolidated").  The Government introduced First Consolidated's incorporation papers and filing statements, which showed that Schwartz controlled the company.[38]  First Consolidated referred investors to FCS and, in return, FCS paid a commission to Schwartz – above and beyond his FCS salary – for each referral.[39]

FCS regularly did business with other corporations owned partly by

---

[37] Summers provided few details about these transactions.

[38] May 20, 1987 incorporation papers listed Schwartz as the incorporator, initial director, and president.  Reinstatement papers filed in 1996 listed Schwartz as president and listed First Consolidated's address, which was the same as FCS's.  First Consolidated's 1997 and 1998 filing statements both listed Schwartz as the president and registered agent.  The 1999 filing statement, however, listed Nikki Nedbor (the attorney who eventually replaced Summers at FCS) as First Consolidated's agent, with Schwartz still as president.  The 2000, 2001, 2002, and 2003 filings listed Schwartz as agent and president.

[39] The Government introduced two checks made from FCS to First Consolidated: a July 31, 1998 check in the amount of $35,000 and a June 24, 1998 check in the amount of $70,000.  Summers testified that he knew that First Consolidated received commissions from FCS, and that, likewise, First Consolidated sometimes sent money to FCS.  He did not know, however, whether the two checks mentioned above represented commission payments.

Schwartz, both by factoring their accounts and by making them loans (many of which were never repaid). Three scenarios recounted by Summers link Schwartz to the Brutonized statements at issue.

First, FCS made a loan to Florida Restaurant Management, which had been formed by Summers at Schwartz's request, for the purpose of purchasing the restaurant Nick's Italian Fishery.[40] Although Summers' testimony is not entirely clear, it seems that FCS was joined in the purchase by Schwartz's consulting firm First Consolidated, defendant Levy, and a man named Alex, the maitre d' at Nick's. Summers "did not issue any stock to First Capital" as a result of the loan, and did not know whether FCS's books accounted for the loan.

Second, FCS loaned around $160,000 to Seahawk Deep Ocean Technology, Inc. ("Seahawk"), a treasure salvager. The loan was secured by a preferred ship's mortgage on one of Seahawk's "research vessels." The value of the lien was based on a three- to four-year-old appraisal of the vessel.[41] Subsequent to the loan, the vessel's crew placed several admiralty liens on it for items like dockage and materials, which turned out to be superior to FCS's interest in the ship. It is unclear whether Seahawk ever repaid the loan.

---

[40] FCS had loaned $100,000 to Nick's Italian Fishery less than a year before.

[41] Ships, Summers noted, often depreciate rapidly.

Third, FCS loaned money to Vanderbilt Square, a company controlled by Schwartz,[42] to purchase the Dry Tortugas treasure from Seahawk.[43] The treasure, a collection of artifacts recovered from a Spanish galleon in the waters of the Dry Tortugas,[44] included gold bars, cannon, jewelry, and astrolabes. According to Summers, "Vanderbilt used a combination of cash and its stock to purchase" the collection. Summers did not know whether FCS documented its loan to Vanderbilt and he did not think Vanderbilt ever repaid it.[45]

On November 4, 2004, the Government called Alan Goldberg as a witness. On March 31, 2000, Schwartz hired Goldberg, a professional bankruptcy trustee and turn-around-artist, to lead FCS to profitability as Chief Operating Officer.

---

[42] At some point, either when FCS loaned money to Vanderbilt or later, Schwartz was the sole director and primary shareholder of Vanderbilt. Summers could not remember whether Schwartz held his interest in Vanderbilt personally or through other companies under his control. In any case, Summers testified unequivocally that Schwartz controlled Vanderbilt Square.

[43] It is unclear from the record whether Seahawk or another salvage company, Odyssey Marine, actually discovered the treasure.

[44] The Dry Tortugas is a chain of seven islands about seventy miles west of Key West, Florida. The islands and its surrounding shoals and waters compose the Dry Tortugas National Park, administered by the National Park Service.

[45] Summers relayed another notable episode involving a deal in which FCS factored the accounts receivable of Q-Pack, a food packaging company. Summers discovered that Q-Pack was fraudulently endorsing the signature of the debtor, Frito-Lay, on letters indicating that Frito-Lay consented to the factoring deal. Summers recommended that FCS stop factoring Q-Pack's invoices, but Schwartz and Horwin overruled him. He later discovered that First Consolidated, owned by Schwartz, and another corporation owned by Horwin were providing consulting services for Q-Pack at the time Summers discovered Q-Pack's fraud.

After FCS's Chapter 11 bankruptcy case[46] was converted to a Chapter 7 liquidation case, Goldberg was appointed trustee to preside over FCS's liquidation. In his capacity as FCS's Chief Operating Officer and, later as the bankruptcy trustee, Goldberg became intimately acquainted with FCS's financial history and its outstanding credits and debts. He testified as follows.

FCS made loans to Florida Restaurant Management for the purpose of buying Nick's and then paid off Nick's debts and carried the payments at first as "accounts receivable," and then as "asset based loans." At that point, Schwartz and Levy both had an ownership interest in Nick's Italian Fishery, according to Goldberg. FCS never collected a dime from Nick's or Florida Restaurant Management.

Goldberg also relayed his role in the hunt for the Dry Tortugas treasure. FCS made a loan to Vanderbilt Square to acquire the collection. That loan was secured by the collection, which FCS had appraised at around $5 million. FCS also made a loan to Michael's Jewelry and Michael's International, both of which promoted and tried to sell the treasure. Eventually FCS acquired possession of the treasure as partial satisfaction of the debt owed by Vanderbilt.

As FCS's bankruptcy trustee, Goldberg was interested in selling the treasure

---

[46] The case was filed on March 31, 2000.

24

to pay back FCS's creditors. Schwartz told him, however, that FCS had already sold and sent the treasure to an Idaho-based corporation called Grand Slam. Goldberg, believing the treasure had been sold for a fraction of its value, traveled to Idaho in the hopes that the collection could be recovered. The president of Grand Slam informed him, however, that the company had never received the goods.

Goldberg, with a "crew" of deputy U.S. marshals and Boca Raton officers, executed a writ of entry in a hunt for the missing treasure. They discovered some of the loot in Schwartz's house and more at FCS's office, in a FedEx box shoved into Schwartz's credenza. They also found 12 "goldfinger" bars worth from $20,000 to $40,000 apiece in a shoe box in a closet in Schwartz's mother's condominium. Goldberg ultimately sold the "treasure" for about $450,000, or about 10% of its appraised value as originally reported by FCS.

According to Goldberg, Schwartz owned and served as the president of a corporation called Big Sun, which benefited from loans issued by FCS.

Goldberg also confirmed Summers' testimony that Schwartz owned and operated First Consolidated. In addition to his salary of $96,000 a year as CEO and president of FCS, Schwartz was paid brokerage commissions by FCS for the deals he negotiated as the operator of First Consolidated. Goldberg identified

25

Schwartz's signature on several checks drawn on accounts held by FCS, two of which were payable to First Consolidated.  The following exchange between the prosecutor and Goldberg is particularly relevant for our <u>Bruton</u> inquiry:

> Q:  [A]re you able to quantify any of the transactions as far as the total dollar figure . . . that you were able to identify as additional compensation paid to Mr. Schwartz over and above the 96,000 we have already talked about?
> . . . .
> A:  Yes, sir.
> Q:  And what general figure do you recall?
> A:  The ninety day period immediately preceding the bankruptcy, so that is ninety days from May 12th or 14th earlier, First Capital Services disbursed to Larry Schwartz $120,000 and $135,000 was disbursed to First Consolidated.  I'm sorry, 126,000 to First Consolidated.

Schwartz's attorney cross-examined Goldberg on that line of questioning. Goldberg said that the money disbursed to First Consolidated was to pay commissions, and "one was to repay a loan that . . . First Consolidated allegedly made to First Capital, two or three I don't recall."  Schwartz's attorney said:

> Q:  First Capital Services, the company with you [Goldberg] at its head, and the committees of unsecured creditors entered into a settlement agreement with First Consolidated, Larry Schwartz, right?
> A:  Correct.
> Q:  And that settlement agreement was for all claims that First Capital Services and the committees of unsecured creditors had against either First Consolidated, Larry Schwartz and actually a Debra Stanley, Z. B. Levin, Sara Levin and Palm Bay Capital, right?
> A:  I believe that's correct.
> Q:  And how much was the amount of that settlement?

26

. . . .

A: 650,000 I believe.

On November 8, the Government called Nikki Nedbor. She testified that Schwartz alone interviewed her for the position of in-house counsel, as Summers' replacement. According to her, Schwartz was the president of Vanderbilt Square, subsequently renamed Treasures & Exhibits International, Incorporated. On November 12, 1999, Nedbor wrote a letter on FCS letterhead to Larry Schwartz, as president of Vanderbilt Square, demanding the collateral of the Dry Tortugas collection in payment of Vanderbilt's debt to FCS.[47]

Stephen Kelley testified on November 9. He is a forensic accountant with the firm Berger, Epstein & Garver, PA, which was hired in January 2000 by FCS's counsel to prepare FCS's tax returns for the years 1996 through 2000. While at FCS's office he learned that Schwartz was "affiliated" with the Big Sun family of

---

[47] The letter states:

Pursuant to terms of that certain promissory note in the amount of $2 million that is dated effective October 1, 1997 in favor of First Capital Services, Inc., be advised that Vanderbilt has failed to make payments of the accrued interest due on November 1, 1997 and all subsequent payments. As a result of said failure, FCS has elected to take possession of some of it's the [sic] collateral that serves as the security for sums due under the note. In particular, FCS hereby demands the delivery of the artifacts known as the Dry Tortugas Artifacts Collection, including but not limited to gold bars, silver coins, pearls, olive jars, beads, three astrolabes, gold chains, rings, various plates, various ceramic pieces, cannon balls, pottery, chards and ballast stones. Please deliver all of said collateral to FCS forthwith. In the event First Capital decides to accelerate the sums due under the note, it shall execute against the collateral in its possession and all other collateral which has been given as security for the loan.

27

corporations.

Kelley offered detailed testimony on FCS's asset based loans from 1997 to sometime in 1999, based on several summary reports of FCS's books. During that time period, FCS issued, <u>inter alia</u>, the following loans: $1,027,062 to Nick's Italian Fishery, $762,607 to Vanderbilt Square, $592,753 to Michael's International, $462,420 to Big Sun, and $154,000 to Seahawk.[48]

On July 19, 1997, FCS began accounting for certain transactions to Big Sun, Nick's, and Michael's International as asset based loans, even though they had originally been carried on the books as accounts receivable. Kelley's team was unable to find documentation to justify that change one way or the other.

2.

On November 10, before calling any witnesses, the Government proffered an "Affidavit of Edward Mark Meyer," which originated as evidence in FCS's bankruptcy proceedings. Schwartz raised "[t]he same objections that we have discussed about <u>Bruton</u>." The court overruled the objection "with the changes we have previously made"[49] and admitted the document into evidence as

---

[48] Kelley also testified that FCS received the following sums in repayment of those loans: $60,000 from Nick's, $40,000 from Michael's International, and about $57,000 from Big Sun.

[49] The court was referring to the redactions the Government had made in an attempt to avoid a <u>Bruton</u> problem, see note 34, <u>supra</u>.

Government's Exhibit 1.76. Then a prosecutor read the text of the statement to the jury.

The affidavit's theme is summed up in its assertion that "First Capital was in the business of factoring account receivables and also made asset-based loans." It states:

Paragraph 9. When First Capital made loans to or advanced monies pursuant to factoring agreements with third parties First Consolidated[50] was paid a commission sometimes approaching 20 percent of the amount advanced.

Paragraph 10. In some instances when First Capital made loans to or factored invoices for third parties, including First Consolidated, it received shares of stock or ownership interest in those third parties. These shares of stock or ownership interests were not entered into the books and records of First Capital. Examples of transactions in which First Consolidated[51] received shares of stock or ownership interest include Superior Waterlogged Lumber and Aviation Composites, Incorporated.

Paragraph 12. I was never able to ascertain that the shares of stock had been properly issued in the name of First Capital and was never able to enter such assets on the company's books.

Paragraph 13. First Capital also made loans and advanced monies to Vanderbilt Square Company and to Michael's International Jewelers

---

[50] Before redaction, this statement read: "First Consolidated Financial Corporation is a company owned [and] controlled by Larry Schwartz."

[51] In this instance, "First Consolidated" was substituted for "Mr. Schwartz," which appeared in the original.

("Michael's Jewelers").[52]  These funds were used by Vanderbilt to purchase the inventory of Michael's Jewelers and other assets.

Paragraph 14.  As part of these transactions with Vanderbilt and Michael's International Jewelers, a large amount of gold coins, pearls, goldfinger bars, silver bars and other artifacts (known collectively as the "Dry Tortugas Treasure") came into the possession of First Capital.  Portions of the treasure were delivered to the offices of First Capital in Boca Raton.  A portion of the gold was personally brought by me and Zachary Metrick,[53] operations manager of First Capital, to First Union Bank, Town Center Branch, located at 5355 Town Center Road, Boca Raton, Florida, 33486, to be stored in a safety deposit box.

Paragraph 15.  In addition to the "Dry Tortugas Treasure," inventory from Michael's Jewelers consisting of numerous watches, including Rolex, Cartier and other designer makes, was also delivered to the offices of First Capital.  These watches were subsequently sold to wholesalers.  The proceeds of these sales did not go into the books and records of First Capital.  These loans and advances were never repaid to First Capital.

Paragraph 16.  In addition to loans made to third parties, on several occasions First Capital loaned substantial sums of money to companies.[54]  Examples of these transactions included loans or factoring arrangements made with Big Sun Investments, Inc., and Florida Restaurant Management, Inc. (which owned and operated a restaurant known as Nick's Italian Fishery).  This included factored invoices for and advanced money to Southern Multi-Capital, which provided paving services for Big Sun.  First Capital was never able to collect on the invoices from Big Sun or never intended to seek

---

[52]  Redacted: "At the time, Mr. Schwartz represented to me that he owned Michael's Jewelers."

[53]  Redacted: "At the direction of Mr Schwartz."

[54]  Redacted: "substantially owned and/or controlled by Larry Schwartz."

collection from Big Sun of the invoices. The invoices totaled hundreds of thousands of dollars.

Paragraph 17. Additionally, First Capital directly paid the invoices generated by materialmen, suppliers and contractors who were providing services and materials to Big Sun Investments for construction work in Ocala, Florida. These amounts totaled in excess of several hundred thousand dollars. Such advances were booked as additional loans to Big Sun. Big Sun, however, never repaid any of the loans or advances made either directly to it or on behalf to its third party creditors.

Paragraph 18. I was directed to issue checks to third party companies without any due diligence being conducted as to whether the loans by First Capital should be made.

After the prosecutor read the statement to the jury, the court instructed the jury to consider it only against Meyer.

B.

The prosecutor's closing argument to the jury before it retired to consider its verdicts included the following remarks on the above evidence:

> We talked earlier about what First Capital did with the money and specifically we know from the discussion and analysis done by Mr. Kelley and Mr. Goldberg and the evidence in this case that First Capital utilized a significant portion of the money that was investor funds to go to asset-based loans, many of which were controlled by or affiliated with Mr. Schwartz. What are some of those companies?
>
> Nick's Italian Fishery, a restaurant. They don't have any accounts receivable. There is no factoring in a restaurant. Who owes you money in a restaurant? The customer that comes in to buy food, buy a meal. There's no accounts receivable there. And Mr. Goldberg testified that when he went in to the books and records of First

31

Capital he discovered that they were doctored records attempting to show that the monies that had been sent to Nick's Italian Fishery were factoring when they were not.

Now, who would do that? There's only two people in this case that would have access to those records and have a motive to do that and that's Edward Meyer and Larry Schwartz.

What are the types of asset-based loans that were involved? Michael's International, Michael's Jewelry, South Mountain Resort, an [asset-based loan]. Big Sun Investment. We know from the records filed with the State of Florida that Mr. Schwartz is a director of that company.

We also know that, with regard to other entities that are listed here, that Vanderbilt Square was a recipient of an asset-based loan. . . . .

Seahawk Deep Ocean, a deep sea diving vessel used in treasurer [sic] hunting.

We know from Mr. Kelley that these ABL's that occurred, $9 million in '98, only $185,000 was collected from those. And with regard to the next year, $4.6 million in asset-based loans, only $654,000 was collected. . . . .

Let's talk about Larry Schwartz. Larry Schwartz, it is undisputed that he, during the relevant years after Mr. Horwin left, that he owned and controlled First Capital. . . .

Mr. Schwartz was responsible in large measure for the ABL diversions. You will recall that deals that occurred and transactions that occurred over the objection or the rejection by the investment committee or the executive committee or the loan committee, whatever name you put on it internally at First Captial [sic] Services, that the only person that really had the authority to override the decisions and the rejections of the ad hoc committee of Zack Metrick, Lee Summers and Edward Meyer was Larry Schwartz, and he did it whenever he pleased because it was his company.

So you can't have it both ways. He was responsible in large measure for diverting most of this money. . . . .

Even more important, however, with regard to Mr. Levy's

32

knowledge of what was really going on, is the evidence in this case that Mr. Levy was a partner with Mr. Schwartz in one of the beneficial years of these asset-based loans, Nick's Italian Fishery. That is pretty darn significant, ladies and gentlemen, because it shows circumstantially that Ray Levy knows Larry Schwartz owns this restaurant.

. . . .

We know that Mr. Meyer knew exactly what was going on with this company and that he aided it despite the fact that he knew what was going on there because he signed a declaration himself in which he admitted that. Government Exhibit 1.76, after this company has gone in the toilet and gone in bankruptcy, the unsecured creditors file a suit, and in connection with this, and this is in the bankruptcy court, in connection with that Mr. Meyer provides an affidavit in which he is being sworn and he indicates various facts that are in this affidavit, and this is Government's Exhibit 1.76.

What is significant about the representations that Mr. Meyer swears are true? In paragraph 9 he says when First Capital made loans with third parties First Consolidated was paid a commission sometimes approaching 20 percent of the amount advanced. From independent evidence in this case you know that the person benefitting from those commissions that paid sometimes 20 percent of the ABL's was Larry Schwartz. The independent evidence has demonstrated to you in this case . . .

[SCHWARTZ'S COUNSEL]: I have an objection at this point and would ask the Court to instruct the jury that evidence again can only be considered as to Mr. Meyer, not as to Mr. Schwartz or any other defendant. That's argument in support of their conspiracy.

THE COURT: Certainly as to this affidavit, that is the case. That affidavit was introduced only as to Mr. Meyer.

[PROSECUTOR]: Let me move on.

With regard to paragraph 13, Mr. Meyer clearly knew, based on his sworn affidavit, that First Capital made loans and advanced monies to Vanderbilt Square and to Michael's International. He clearly knew that First Capital was diverting investor funds to these purposes while he worked at First Capital. That, ladies and gentlemen, shows you knowing participation and aiding and abetting

33

a fraud conspiracy.

. . . .

Count 20, Count 20 is Edward Meyer signing a check on the First Capital account during this time period investor funds from U.S. Capital are in that account, this is April of 1999, the check is for the amount of $3,495 and the person, the entity to whom this check is cut is First Consolidated.

Now, First Consolidated, from the face of this check you can't tell who that is. You don't know who controls that. We only know if you go to the records of the State of Florida or subpoena the account of First Consolidated that it's Larry Schwartz. It's not apparent from this where the money came from, originally U.S. Capital investors, or who's benefitting from this check. That's a concealment and that's Count 20.

. . . .

With regards to Count 22, same comments as before with regards to First Consolidated. This particular check is a check apparently signed by Larry Schwartz himself on May 5th of '99 with First Capital. We know from Steve Kelly most of the money in the account during this time period had been provided by U.S. Capital.

And again a check to First Consolidated, you cannot tell from the face of the check where the money came from originally or who controls the money when this check was cashed or deposited. And again there's no Larry Schwartz endorsement on the back of that. It just says, "For Deposit Only, First Consolidated." That is evidence of concealment, ladies and gentlemen.[55]

---

[55] After the Government's closing argument, Schwartz's attorney moved the court for a mistrial. He argued as follows:

[The prosecutor] placed in front of the jury the affidavit of Ed Meyer that the Government has persisted in telling you they cleaned up so it doesn't impact on Larry Schwartz so that they can use it just against Mr. Meyer, and in arguing conspiracy aspects of the case not only did he, not only did he suggest that it transgressed the rule, that the affidavit only refers to First Capital Services, he flat-out said that that affidavit was proof of guilt as to Larry Schwartz. He referred to Larry Schwartz directly.

The court denied the motion, stating:

C.

A criminal defendant prosecuted by the United States enjoys the Sixth Amendment right "to be confronted with the witnesses against him." U.S. Const. amend. VI. One purpose of the right is to enable the accused to cross-examine, and thereby test the credibility and evidentiary force of, the witnesses against him. See Bruton, 391 U.S. at 136, 88 S. Ct. at 1628.

In Bruton, the Supreme Court held that the admission of "powerfully incriminating extrajudicial statements of a codefendant" violates the Sixth Amendment's Confrontation Clause, even if the court issues an instruction to the jury not to consider the statement as evidence against the defendant. Id. at 135, 88 S. Ct. at 1627. The Supreme Court reasoned that "in the context of a joint trial we cannot accept limiting instructions as an adequate substitute for [the defendant's] constitutional right of cross-examination," id. at 137, 88 S. Ct. at 1628, the finest tool for testing the credibility of a codefendant's "devastating" statement against the defendant, id. at 136, 88 S. Ct. at 1628. See also id. at 138, 88 S. Ct. at 1629 ("A basic premise of the Confrontation Clause, it seems to me, is that certain kinds

I think the context of the, of Mr. Carlton's argument at that time was with respect to Mr. Meyer's knowledge, and so his argument was appropriate. I at your request again gave the instruction that the affidavit could not be considered as to any other defendant. But I don't see anything improper in the argument that he gave.

35

of hearsay . . . are at once so damaging, so suspect, and yet so difficult to discount, that jurors cannot be trusted to give such evidence the minimal weight it logically deserves, <u>whatever</u> instructions the trial judge might give.") (Stewart, J., concurring).  Still, the Court acknowledged that "[n]ot every admission of inadmissible hearsay or other evidence can be considered to be reversible error unavoidable through limiting instructions."  <u>See</u> <u>id.</u> at 135, 88 S. Ct. at 1627.

In <u>Richardson v. Marsh</u>, 481 U. S. 200, 107 S. Ct. 1702, 95 L. Ed. 2d. 176 (1987), the Supreme Court held that "the Confrontation Clause is not violated by the admission of a nontestifying codefendant's confession with a proper limiting instruction when, as here, the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence." <u>Id.</u> at 211, 107 S. Ct. 1709.  To come to its conclusion, the Court examined the totality of the Government's case against Richardson and the precise nature of the codefendant statement allegedly inculpating her.[56]  It noted that "the confession was not

---

[56] Petitioner Richardson was tried jointly with Benjamin Williams for assaulting Cynthia Knighton and murdering two others in the course of a robbery.  A third coconspirator, Kareem Martin, was at large at the time of their trial.  At trial, Knighton testified that Richardson was present throughout the course of the robbery but did not participate in the shootings.  The State also introduced William's confession, which "was redacted to omit all reference to [Richardson] – indeed, to omit all indication that <u>anyone</u> other than Martin and Williams participated in the crime," and  "largely corroborated Knighton's account of the activities of persons other than [Richardson]." <u>Richardson v. Marsh</u>, 481 U. S. 200, 203-04, 107 S. Ct. 1702, 1705, 95 L. Ed. 2d. 176 (1987).  Williams' confession stated that "Kareem [Martin] said he would have to take [the victims] out after the robbery" while the two were on their way over to Knighton's house.

incriminating on its face, and became so only when linked with evidence introduced later at trial (the defendant's own testimony)." Id. at 208, 107 S. Ct. at 1707. Therefore, unlike in Bruton, the trial court's limiting instruction immunized the potentially incriminating statement against a Confrontation Clause violation.[57] The Court "express[ed] no opinion," however, "on the admissibility of a confession in which the defendant's name has been replaced with a symbol or neutral pronoun." Id. at 211 n. 5, 107 S. Ct. at 1709 n.5.

In Gray v. Maryland, 523 U.S. 185, 118 S. Ct. 1151, 140 L. Ed. 2d 294 (1998), the Supreme Court held that a "redaction that replaces a defendant's name

---

Id. at 204 n.1, 107 S. Ct. at 1705 n.1. The trial court instructed the jury not to consider the confession as evidence against Richardson.

Richardson took the stand in her case in chief. She testified that she was with Williams throughout the robbery but not during the shootings, corroborating the testimony of Knighton. To show she did not know that the robbery would end in a shooting, she testified that she could not overhear the conversation between Williams and Martin as the three traveled to Knighton's.

In the prosecutor's closing argument, he initially reminded the jury not to consider Williams' confession against Richardson. Later, though, he "linked respondent to the portion of Williams' confession describing [Williams'] conversation with Martin in the car," and Richardson did not object. The court reiterated the prohibition on considering the confession against Richardson before the jury retired. Id. at 205, 107 S. Ct. at 1706.

As stated in the text, supra, the Supreme Court concluded that the redaction of any reference to Richardson's existence, coupled with a limiting instruction, immunized the admission of the confession from a Confrontation Clause violation. The Court noted, however, that on remand the trial court should consider whether the failure of Richardson's attorney to object to the prosecutor's statements at closing argument which, directly linking Richardson to Williams' confession, constituted an error on which a petition for a writ of habeas corpus may be granted. Id. at 211, 107 S. Ct. at 1702.

[57] The Richardson Court reaffirmed the pragmatic value of presuming that a jury will follow the court's limiting instruction, 481 U.S. at 211, 107 S. Ct. at 1709, explaining that Bruton was a "narrow exception" to that rule, id. at 207, 107 S. Ct. at 1707.

with an obvious indication of deletion, such as a blank space, the word 'deleted,' or a similar symbol" violates the rule announced in <u>Bruton</u>.  <u>Id.</u> at 192, 118 S. Ct. at 1155.  Just like in <u>Richardson</u>, the Court recounted the other evidence admitted against the defendant, the nature of the codefendant statement against him, and how the prosecution used that statement at trial.[58]

The Court conceded that <u>Richardson</u> "limited <u>Bruton</u>'s scope," <u>id.</u> at 189, 118 S. Ct. at 1154, placing outside of it "those statements that incriminate inferentially." <u>Id.</u> at 195, 118 S. Ct. at 1156.  "But inference pure and simple cannot make the critical difference,"[59] <u>id.</u>, the Court added, explaining that "<u>Richardson</u> must depend in significant part upon the <u>kind</u> of, not the simple <u>fact</u>

---

[58]  Per the trial court's instruction, the Government had redacted a confession by Gray's only codefendant.  The redaction replaced Gray's name and the name of a coconspirator (who died before trial) with a blank space or the word "deleted."  A police detective read the redacted statement in court and said "deleted" or "deletion" every time he came upon a blank space or the word "deleted."  In addition, "[i]mmediately after the police detective read the redacted confession to the jury, the prosecutor asked, 'after he gave you that information, you subsequently were able to arrest Mr. Kevin Gray; is that correct?'  The officer responded 'That's correct.'"  <u>Gray v. Maryland</u>, 523 U.S. 185, 188-89, 118 S. Ct. 1151, 1153, 140 L. Ed. 2d 294 (1998).  The State submitted a copy of the redacted statement into evidence and produced other witnesses who testified that a group of six people, including Gray, participated in the beating.  Gray took the stand and denied his involvement in the crime.

[59]  The Court noted that allowing all statements that incriminate by inference "would also place outside <u>Bruton</u>'s scope confessions that use shortened first names, nicknames, descriptions as unique as the 'red-haired, bearded, one-eyed man-with-a-limp,' and perhaps even full names of defendants who are always known by a nickname." <u>Gray</u>, 523 U.S. at 195, 118 S. Ct. at 1156 (citation omitted).

of, inference," id. at 196, 118 S. Ct. at 1157.[60]

The inference required in Richardson was of a different kind than the one required to link the defendant to the codefendant's statement in Gray. In Richardson, the statement "did not refer directly to the defendant himself," id. at 196, 118 S. Ct. at 1157, and allowed an inference of guilt "'only when linked with evidence introduced later at trial,'" id. (quoting Richardson, 481 U.S. at 208, 107 S. Ct. at 1707). In contrast, the codefendant statement in Gray "obviously refer directly to someone, often obviously the defendant, and which involve inferences that a jury ordinarily could make immediately, even were the confession the very first item introduced at trial." Id. "Moreover," the Court noted, "the redacted confession with the blank prominent on its face, in Richardson's words, 'facially incriminates' the [defendant]," id. (quoting Richardson, 481 U.S. at 209, 107 S. Ct. at 1709), even without naming him.

In 1999, the year following Gray, we evaluated three different Bruton claims, none of which was factually identical to Bruton, Richardson, or Gray. In United States v. Taylor, 186 F.3d 1332 (11th Cir. 1999), we addressed a

---

[60] Although the Court described its majority opinion as of a piece with Richardson, the dissent characterized Gray as "chang[ing]" "the line drawn in Richardson," 523 U.S. at 200, 118 S. Ct. at 1159, which did not "extend Bruton to confessions that incriminate only by inference from other evidence," id. at 201, 118 S. Ct. at 1159.

39

codefendant statement that replaced the defendant's name with neutral pronouns.

We wrote:

> Although the Supreme Court did not express any opinion in Richardson about the admission of a statement that includes neutral pronouns, the Eleventh Circuit has dealt with the issue. Under our precedent, the admission of a co-defendant's statement that contains neutral pronouns does not violate the Confrontation Clause so long as the statement does not compel a direct implication of the defendant's guilt.

Id. at 1336 (citing United States v. Vasquez, 847 F.2d 1515, 1518 (11th Cir. 1989) (per curiam)). The court concluded that the codefendant statement did not necessarily implicate the defendant. Id.

We addressed a codefendant statement that referred to the defendant by nationality and a physical description in United States v. Gonzalez, 183 F.3d 1315 (11th Cir. 1999). Because "[f]rom other evidence, including Buitrago's own confession, it became obvious at trial that the Colombian was Buitrago," id. at 1322, we held that the trial court violated Bruton by admitting the statement (though the mistake amounted to harmless error). Id. at 1323. Another codefendant statement introduced in Gonzalez replaced the defendants' names with neutral nouns, such as "a couple of people" and "the people." We held that

40

the redacted statement implicated the defendants in violation of <u>Bruton</u> and <u>Gray</u>.[61]

In the drug conspiracy case <u>United States v. Ramirez-Perez</u>, 166 F.3d 1106 (11th Cir. 1999), we addressed a codefendant statement even more vague than those described above. A Government agent testified regarding a post-arrest statement by the codefendant. "He said the pistol belonged to him," asked to have the pistol brought to the drug transaction at issue, and "stated he wanted the pistol at the location for protection in case [the undercover agent] tried to rip him off." <u>Id.</u> at 1109. Other evidence suggested that the defendant brought a pistol to the codefendant. The Government conceded that admitting the codefendant statement that passively referred to some actor who brought a pistol to the codefendant inculpated the defendant in violation of <u>Bruton</u>. We validated that concession by holding that the <u>Bruton</u> violation was not a harmless error because it was the only evidence showing the defendant had knowledge that the transaction at issue was for drugs. <u>Id.</u> at 1110-11.

We think the proper <u>Bruton</u> standard is clear from a close reading of <u>Bruton</u>, <u>Richardson</u>, <u>Gray</u>, and our subsequent <u>Bruton</u> decisions: a defendant's confrontation right is violated when the court admits a codefendant statement that,

---

[61] That violation was not harmless because the codefendant statement was the only evidence linking the implicated defendants to the crime. <u>Gonzalez</u>, 183 F.3d at 1323 (11th Cir. 1999).

in light of the Government's whole case,[62] compels a reasonable person to infer the defendant's guilt.

D.

In this case, Meyer's affidavit "powerfully incriminat[ed]" Schwartz by summarizing the loans FCS made to other companies Schwartz controlled. See Bruton, 391 U.S. at 135, 88 S. Ct. at 1627. Even though Meyer's statement "was not incriminating on its face, and became so only when linked" with other evidence, Richardson, 481 U.S. at 208, 107 S. Ct. at 1707, we think that the statement compelled an inference that Schwartz directed FCS to use investor monies to line the coffers of his personal business enterprises. Any doubt that the limiting instructions were ineffective was erased when the prosecutor, in his closing argument, expressly linked Schwartz to the companies named in Meyer's statement.

The trial evidence besides the affidavit was sufficient to link Schwartz to FCS and his other corporations. Although the trial was lengthy and the Government called forty-two witnesses, the evidence showing Schwartz controlled FCS and that he personally benefited from FCS loans to companies like First

---

[62] We look at everything the Government presented to the jury, not just admissible evidence, because a statement violating Bruton by definition is inadmissible as evidence, and a limiting instruction does not cure it.

Consolidated, Florida Restaurant Management, Seahawk, and Vanderbilt Square would not have been lost on the jury. FCS's attorneys Lee Summers and Nicki Nedbor, and FCS's Chief Operating Officer-turned-bankruptcy trustee Alan Goldberg, were in many ways star witnesses. Each had worked for Schwartz at FCS, knew FCS's corporate structure and its transactions, and together their testimony took the equivalent of about five trial days out of a total of only fifteen in the Government's case in chief.

The evidence showed that Schwartz controlled the day-to-day operations of FCS, made all hiring and firing decisions, and regularly overrode the investment committee's recommendations, effectively directing FCS's investment strategies. Indeed, the fact that corporations owned or controlled by Schwartz received loans from FCS presents circumstantial evidence that he had substantial, if not unilateral power over how FCS used investor funds.

Moreover, the Government presented sufficient evidence to show that Schwartz owned or controlled a number of corporations receiving loans from FCS. Money was constantly sloshing back and forth from FCS and First Consolidated, owned by Schwartz. FCS loaned money to Nick's Italian Fishery and then Florida Restaurant Management, created for Schwartz as a vehicle to purchase Nick's. FCS also issued loans to numerous corporations, including Schwartz's Vanderbilt

43

Square, to purchase the Dry Tortugas collection. The treasure was ultimately found divided between Schwartz's desk at work, his apartment, and his mother's condominium. FCS also made loans to Big Sun, owned by Schwartz.

In light of the foregoing, Meyer's affidavit "obviously referr[ed]" to Schwartz, Gray, 523 U.S. at 196, 118 S. Ct. at 1157, without naming him. See Gonzalez, 183 F.3d at 1322 ("[From other evidence, including [the defendant's] own confession, it became obvious at trial that the Colombian was Buitrago."). By naming Schwartz's corporations after the jury had heard lengthy testimony regarding the extent of Schwartz's ownership and control of them, the codefendant statements compelled an inference against Schwartz even more forcefully than a statement could that replaces a defendant's name with a neutral pronoun. See United States v. Taylor, 186 F.3d 1332, 1336 (11th Cir. 1999).[63]

The affidavit was particularly damaging because it summarized in one

---

[63] Of course, merely naming a corporation owned or controlled by the defendant is not a per se Bruton violation. We addressed a similar scenario in United States v. Williamson, 339 F.3d 1295 (11th Cir. 2003). In that case, the court admitted a redacted codefendant statement naming the defendant's corporation. Id. at 1302. The panel determined that the case was "covered by Richardson" because it was not "obviously redacted" as in Gray. Id. at 1303 (quotation omitted).

We think this case is different from Williamson because here the prosecutor linked Schwartz to the codefendant statement by name. We also think that Williamson, to the degree it limits Gray's logic to "obviously redacted" statements, does not comport with our prior decisions such as Taylor, Gonzalez, and Ramirez-Perez, by which we are bound. See United States v. Turner, 474 F.3d 1265 (11th Cir. 2007); United States v. Thomas, 271 Fed. Appx. 818 (11th Cir.); Scott v. Upton, 208 Fed. Appx. 774 (11th Cir. 2006).

44

streamlined and articulate statement all of the Government's evidence of

Schwartz's self-dealing with investor money, all without expressly naming him.[64]

If the affidavit was insufficient to compel an inference of guilt based on the

trial testimony alone, the inference was made inevitable – and therefore

"devastating" – when the prosecutor expressly made that connection for the jury in

his closing argument.  See Bruton, 391 U.S. at 136, 88 S. Ct. at 1628.  He first

reminded the jury that "it is undisputed that [Schwartz], during the relevant years

after Mr. Horwin left, that he owned and controlled First Capital," and that "Mr.

Schwartz was responsible in large measure for the ABL diversions" to companies

such as Nick's Italian Fishery, Big Sun Investments, Seahawk, and Vanderbilt

Square, several of which were owned by Schwartz.  He then expressly referred to

---

[64] Although our focus is on the post-redacted version of the statement, the fact that the Government swapped "First Consolidated" for "Mr. Schwartz" suggests that the Government thought the two were interchangeable.  Doubtless the jury concluded the same.

This dilemma highlights the practical difficulties of redacting a codefendant statement without draining its meaning.  A redaction is not a magic charm, an amulet against constitutional violation.  Nor is it simple arithmetic.  If done too liberally, redaction risks inaccuracy by eliminating words that played an integral role in establishing the statement's meaning.  This idea is memorialized in the interpretive canon of noscitur associatus.  If performed too sparingly, though, redaction jeopardizes the confrontation rights of the nonconfessing codefendant.  See Gray v. Maryland, 523 U.S. 185, 118 S. Ct. 1151, 140 L. Ed. 2d 294 (1998).  Of course, "viable alternatives do exist," Bruton, 391 U.S. at 133, 88 S. Ct. at 1626, when redacting a defendant's statement proves unsatisfactory: a prosecutor can either try the defendants separately and use the confessing defendant's confession against him in toto, or do without the confession.  We recognize the efficiency of joint trials and their economic benefits for the justice system, but economy without constitutional fairness is just a system, not our justice system.  See Id. at 135, 88 S. Ct. 1627.

45

Meyer's bankruptcy affidavit, stating "this is Government's Exhibit 1.76"[65] and reminded the jury that "[f]rom independent evidence in this case you know that the person benefitting from those commissions [to First Consolidated] that paid sometimes 20 percent of the [asset based loans] was Larry Schwartz." After Schwartz's sustained objection at this point, the prosecutor took another approach to equate Schwartz with First Consolidated, by reminding the jury that First Consolidated's incorporation papers listed Schwartz as the owner.

In sum, the Government was relying on the jury to equate Schwartz with the corporations named in the codefendant statement, and we agree that, by the time the jury retired to its deliberations, its reasonable members would have inferred from the statement that Schwartz – in violation of his representations to investors – directed FCS to issue unsecured asset-based loans, frequently to his own companies.

E.

A <u>Bruton</u> violation requires a new trial unless the error was harmless beyond a reasonable doubt. <u>Schneble v. Florida</u>, 405 U.S. 427, 432, 92 S. Ct. 1056, 1060, 31 L. Ed. 2d 340 (1972) (noting that a new trial is required if "there is

_____

[65] Although the transcript it silent on the issue, we can only assume that the prosecutor was holding the affidavit in is hands and showing it to the jury when he stated "this is Government Exhibit 1.76."

a reasonable possibility that the improperly admitted evidence contributed to the conviction"); Harrington v. California, 395 U.S. 250, 254, 89 S. Ct. 1726, 1728, 23 L. Ed. 2d 284 (1969) ("Our judgment must be based on our own reading of the record and on what seems to us to have been the probable impact of the [codefendant statements] on the minds of an average jury."); United States v. Gonzalez, 183 F.3d 1315, 1323 (11th Cir. 1999). We have explained this standard as follows: "[a] Bruton error is harmless only if the properly admitted evidence of guilt is so overwhelming, and the prejudicial effect of the co-defendant's statement so insignificant, that beyond any reasonable doubt the improper use of the statement was harmless." United States v. Doherty, 233 F.3d 1275, 1282 (11th Cir. 2000).

We cannot say that the admission of Meyer's affidavit, and the indispensable role it played in the prosecutor's closing argument to the jury, was harmless beyond a reasonable doubt. Ironically, it is in part the strength of the testimony of witnesses like Summers, Goldberg, and Nedbor that transformed the affidavit's references to Schwartz's corporations into a Bruton violation. Still, we do not think that the weight of that evidence is so great as to marginalize the significantly prejudicial impact of the affidavit.

Although the disparate evidence against Schwartz was sufficient to compel

47

an inference that Schwartz equaled his corporations in the context described by the affidavit, that evidence – though organized and summarized in this opinion – was presented to the jury piecemeal, over the course of numerous hours of testimony that meandered across various subjects and was punctuated by objections, argument, rulings, and breaks in the trial.

The affidavit, by contrast, articulately summarized the evidence preceding it. It was admitted into evidence as a written document and available for study by the members of the jury during its deliberation. It impacted the jury like a prosecutor's closing argument, except it was available to the jury in its deliberations as an admitted exhibit, and, as a written document, was not subject to the vagaries of jurors' memories.

In addition, the statement's source lent it singular credibility; Meyer was FCS's controller during the course of the alleged conspiracies and his testimony made under oath to the bankruptcy court could reasonably be perceived as unusually reliable, particularly as a confession that clearly did not help him avoid prosecution. The prosecutor, recognizing the unique power of the statement as evidence against Schwartz, resorted to it in his closing argument despite the weight of the other evidence against him. We cannot say that the Government's use of the statement was harmless.

Meyer challenges the indictment on the ground that the grand jury returned it on the basis of his immunized statements to the grand jury.

A.

On October 5, 2002, an Assistant United States Attorney for the Southern District of Florida sent a "proffer letter" to Edward Meyer's attorney, granting Meyer limited use immunity in exchange for his cooperation with investigative interviews. Government agents thereafter interviewed Meyer four times in November and December 2002.

On February 17, 2004, and then again on April 27, FBI Special Agent Gary Hellmer, the case agent, testified as to the substance of those four interviews to a grand jury, which ultimately returned the superceding indictment against Meyer and the other defendants.

The jury trial began on October 19, 2004. After Hellmer testified on November 10, the Government turned over his grand jury statements to Meyer pursuant to the Jencks Act, 18 U.S.C. § 3500.[66] Meyer thereby learned that

---

[66] The Jencks Act, 18 U.S.C. § 3500, states:

> (b) After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement (as hereinafter defined) of the witness in the possession of the United States which

Hellmer had testified as to the substance of Meyer's immunized statements before the grand jury. Meyer believed his statements were immune from direct use by the Government before the grand jury. On November 15, he filed a motion to dismiss the indictment or, alternatively, for a mistrial on the ground that the Government obtained the indictment in violation of his Fifth Amendment right against self-incrimination.[67] The court stayed consideration of the motion until the jury returned its verdict.

On December 1, the jury found Meyer guilty of two counts of conspiracy and one count of money laundering. The court held a hearing on Meyer's motion on February 16, and entered a written order denying it on March 14. The court found that the agreement was ambiguous as to whether Meyer's proffer statements were immune from direct use by the Government before the grand jury. The court therefore construed the agreement in Meyer's favor and found that the Government violated it by making direct use of Meyer's statements before the

---

relates to the subject matter as to which the witness has testified.
. . . .
(e) The term "statement", as used in subsection[](b) . . . means -
. . . .
(3) a statement, however taken or recorded, or a transcription thereof, if any, made by said witness to a grand jury.

[67] At no point has Meyer alleged that the Government violated or attempted to violate his immunity agreement during trial.

grand jury. The court concluded that the error was harmless, though, because the

statements in question were not admitted at trial and the jury still convicted him.[68]

Meyer appeals, arguing that the Government violated his immunity agreement, and

thereby violated his Fifth Amendment privilege against self-incrimination.

B.

1.

Meyer's argument requires that we first review the scope of his immunity

agreement, which we interpret like a contract. See Taylor v. Singletary, 148 F.3d

1276, 1284 (11th Cir. 1998).[69] That agreement states:

> 1. The United States agrees that any statement made by [Meyer]
> during the proffer will not be used against him during the United
> States' case in chief should [Meyer] proceed to trial in any matter
> being investigated in the Southern District of Florida.

> 2. Should [Meyer] proceed to trial in any case that may be indicted in
> the Southern District of Florida and testify on his behalf . . . the
> United States may use any statements made by [Meyer] during the

---

[68] To support its reasoning, the court quoted a Ninth Circuit case, Guam v. Muna, 999 F.2d 397 (9th Cir. 1993), which itself cites to the Supreme Court's opinion in United States v. Mechanik, 475 U.S. 66, 106 S. Ct. 938, 89 L. Ed. 2d 50 (1986). Mechanik was a case about the Government's violation of Fed. R. Crim. P. 6(d). Because we affirm the district court's ruling on another ground, we state no opinion about the propriety of applying Mechanik's formula to an alleged Fifth Amendment violation.

[69] We review a court's denial of a motion to dismiss an indictment for abuse of discretion, United States v. Pielago, 135 F.3d 703, 707 (11th Cir. 1998), but in determining whether the court abused its discretion, we resolve issues of law, including the meaning of Meyer's immunity agreement, de novo, see Taylor v. Singletary, 148 F.3d 1276, 1284 (11th Cir. 1998).

proffer to cross-examine [Meyer].

3.  The United States may make derivative use of the statements [Meyer] makes during the proffer and may pursue investigative leads therefrom, and would not be required to prove an independent source at any Kastigar or other hearing held thereon.  By signing this agreement [Meyer] agrees to waive any right to a Kastigar hearing in the future.

4.  Should [Meyer] intentionally provide any false, incomplete or misleading information or testimony, any statement made by [Meyer] during the proffer may be used in the prosecution's direct case of any other criminal violations, including but not limited to the offenses of perjury, obstruction of justice and false statements to government agencies.

In other words, the United States is extending [Meyer] only limited "use immunity" for nonviolent offenses during the course of the proffer; neither "derivative use immunity" nor "transactional immunity" is applicable to the proffer.
. . . .

Finally, Mr. Meyer should understand that there are no agreements as to the number or nature of any charges that may be brought, or sentences recommended in this or any other District in the United States.  In other words, this agreement does not guarantee that he will not be charged with a crime; the agreement only guarantees that his statements will not be used against him in the government's case in chief.

## 2.

We note at the outset that Meyer's immunity agreement does not directly address whether the Government may introduce his statements to a grand jury. The first paragraph provides that the Government may not use his statements

directly against him in its case in chief at trial. The final paragraph likewise states

that "the agreement only guarantees that his <u>statements</u> will not be used against

him in the government's case in chief." Those assertions, standing alone, seem to

allow the Government to use his statements in any way except as evidence in its

case in chief. Paragraphs two, three, and four of the agreement, however, list

specific ways that the Government may use Meyer's statements. Absent from the

list is direct use of the statements before a grand jury. Applying the doctrine of

<u>expressio unius est exclusio alterius</u>, or "the expression of one excludes

alternatives," the district court concluded that the agreement was ambiguous as to

that term.

We think, however, that the parties' intent as to the scope of immunity is

expressed in the third paragraph. The first sentence of that paragraph provides

that the Government may make "derivative use" of Meyer's statements; that is, the

Government may use his statements as a springboard to find evidence or other

witnesses to testify against him. The second sentence in paragraph three provides

that "[Meyer] agrees to waive any right to a <u>Kastigar</u> hearing in the future." A

"<u>Kastigar</u> hearing"[70] is a hearing to determine if the Government has introduced

---

[70] In <u>Kastigar v. United States</u>, 406 U.S. 441, 92 S. Ct. 1653, 32 L. Ed. 2d 212 (1972), the defendant was compelled by court order to testify pursuant to a statutory grant of immunity. In determining whether the compulsion amounted to a Fifth Amendment violation

53

testimony before the grand jury, or plans to introduce testimony at trial, that violates the defendant's immunity and Fifth Amendment privilege against self-incrimination.  United States v. Harvey, 869 F.2d 1439, 1441 (11th Cir. 1989). Pursuant to Fed. R. Crim. P. 6(d)(1),[71] a defendant is not present at his own grand jury hearing to object to the Government's testimony during the proceedings. Thus, the only way for a criminal defendant to challenge an indictment on the ground that the Government obtained it in violation of his Fifth Amendment privilege against self-incrimination is via a Kastigar hearing.  See United States v. Schmidgall, 25 F.3d 1523, 1527-29 (11th Cir. 1994).[72]

3.

Although the agreement does not state explicitly that the Government may

---

notwithstanding the statutory grant of immunity, the Supreme Court held that a statute that provides "use and derivative-use immunity is constitutionally sufficient to compel testimony over a claim of the [Fifth Amendment] privilege [against self-incrimination]."  Id. at 458, 92 S. Ct. at 1664.  A defendant may seek a Kastigar hearing on an alleged Fifth Amendment violation whether that alleged violation arises from court-compelled testimony, as in Kastigar, or out of an alleged breach of an immunity agreement, as in Meyer's case.  See generally United States v. Schmidgall, 25 F.3d 1523 (11th Cir. 1994).

[71]  "The following persons may be present while the grand jury is in session: attorneys for the government, the witness being questioned, interpreters when needed, and a court reporter or an operator of a recording device."  Fed. R. Crim. P. 6(d)(1).

[72]  Once the defendant shows that his statements were made pursuant to a grant of immunity, the Government bears the "heavy burden of proving that all of the evidence it [used or] proposes to use was derived from legitimate independent sources."  Kastigar v. United States, 406 U.S. 441, 461-62, 92 S. Ct. 1653, 1665.

use Meyer's statement directly before the grand jury, we think it is nonetheless clear when read holistically. Meyer waived his right to a <u>Kastigar</u> hearing. Put differently, he waived his right to challenge the Government's use of his statements before the grand jury. We cannot conclude that he left himself vulnerable to what he characterizes as a Fifth Amendment violation but voluntarily waived his right to learn about and seek a remedy for that violation. The only reasonable inference is that Meyer intended to waive his Fifth Amendment privilege against use of his statements before the grand jury.

That inference is strengthened by an application of the interpretive doctrine of <u>noscitur a sociis</u>, or a phrase is "known by its associates." In paragraph three of the agreement Meyer first voluntarily waives his Fifth Amendment privilege against derivative use of his statement against him at trial. In the next sentence he waives his right to a <u>Kastigar</u> hearing. We think the parties intended paragraph three to list ways the Government could use Meyer's statements notwithstanding the Fifth Amendment.

We conclude that Meyer clearly waived his privilege against self-incrimination before a grand jury by waiving his right to challenge the Government's introduction of his statements before the grand jury. We therefore affirm the court's denial of Meyer's motion to dismiss the indictment on the

ground that the Government did not violate its immunity agreement with Meyer.

## IV.

Levy and Orlick were convicted on Count 1 of the superceding indictment, which charged that they and the other defendants "did knowingly and willfully combine, conspire, confederate, agree and reach a tacit understanding with each other" to commit mail fraud (18 U.S.C. § 1341) and interstate transportation of stolen property (18 U.S.C. § 2314), in violation of 18 U.S.C. § 371. Levy was also convicted of conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h) under Count 8.[73]

Levy and Orlick argue that there was insufficient evidence to prove that they knowingly and willfully agreed and participated in the alleged conspiracy. Their theory is that FCS misused investor funds without their knowledge and that U.S. Capital did not misuse investor funds.[74] We consider Levy's argument first.

## A. Levy

---

[73] Both were convicted of mail fraud (Counts 2-5), interstate transportation of stolen property (Counts 6-7), and various permutations of money laundering (Levy for Counts 9, 13, 15-19, 21, and 24 and Orlick for Counts 19, 21, and 24). Orlick was convicted of engaging in a monetary transaction in criminally derived property (Count 25).

[74] Levy and Orlick also challenge their convictions of the substantive crimes that were the object of the conspiracy on the ground that the underlying scheme was not fraudulent, and they therefore lacked the requisite mens rea to commit mail fraud, money laundering, and interstate transportation of stolen property. Because we hold there was sufficient evidence to support the jury's conspiracy verdicts, we dismiss their claims as to the other crimes.

56

1.

a. The creation of U.S. Capital.

In 1997, Levy sold FCS senior capital notes through his companies American Benefits and Asset Based Management. In spite of a Department investigation into the note program, and just a few days before FCS represented to the Department that it would no longer sell or renew senior capital notes, Levy formed U.S. Capital in December 1997 for the purpose of selling effectively identical senior capital notes to individual investors. Levy owned U.S. Capital, was its president until Orlick took over that role, and was its director throughout the alleged conspiracy.

b. Levy's representations to brokers and investors.

U.S. Capital furnished brokers and investors with sales brochures representing that their money would be used to invest in FCS's factoring program, to be invested strictly in insured corporate and government receivables. The brochures also represented that investor funds would be segregated and that the notes were liquid upon written notice, subject to a fee of one month's interest for early liquidation. According to Zendell Katz, a broker, "[Levy] was responsible for printing and marketing and advertising" the notes program.

Additionally, Levy and Schwartz together met with brokers on several

occasions to explain the notes program.  They echoed the representations in the

brochures and on the face of the notes.[75]

## c.  FCS's asset based loans.

[75]  John Pennington, a Charterhouse insurance broker from Lynchburg, Virginia, testified that in 1997 Levy went to Roanoke, Virginia, to pitch viatical settlements to the insurance and investment brokers with Charterhouse Group.  In the fall of 1997, Levy sent FCS senior capital note brochures to the Charterhouse brokers for their consideration.  Sometime in 1998, Levy and Schwartz flew in a private jet, believed by Pennington to belong to Schwartz, to Virginia for a meeting to explain the senior capital note program to the Charterhouse brokers.  The meeting lasted about two and a half hours.  Schwartz did most of the talking; he echoed the brochure's representations that investor money would be spent strictly on insured corporate and government accounts receivable and walked through a blank note with the brokers.  Levy did not contradict him.  According to Pennington, it looked like Levy and Schwartz were working together and that Levy raised money for Schwartz in a "close business relationship."

In June 1999, Brian Kreider, an independent broker from Virginia who worked with Charterhouse, spoke on a conference call with Schwartz, Levy, Pennington, and potential invester James Hurd regarding the senior capital note program.  Again Schwartz reiterated the familiar representations of the sales brochure and Levy backed him up.  Hurd, an experienced investor, was hesitant.  He made suggestions to Schwartz and Levy that would make the program "foolproof," including, according to Kreider, that FCS and U.S. Capital should set up two corporate bank accounts, one operating account for commissions and one bonded trust account to protect investors from embezzlement or fraud.  Schwartz told Hurd that FCS would create a trust account for his funds if he invested at least $500,000, but Hurd declined to invest that much at once.  Hurd ultimately, though, invested about $750,000 in U.S. Capital notes signed by Orlick.  In early 2000 or so, Kreider began trying to contact Levy with concerns about the note program.  Levy admitted that there were problems paying back investors and stated that U.S. Capital had put investor funds into other factoring companies, citing problems with FCS.

In May 1999, John Pennington travelled to Florida to meet with Levy regarding Levy's viatical program, into which Pennington had placed some of his clients.  Schwartz, Levy, and Pennington went to dinner.  Levy stated that he "was in trouble, would be in more, and would have a hard time paying back investors."

Zenon Rawley, partner in the brokerage firm of RHC Financial Group ("RHC"), testified that Levy called her firm in 1998 to pitch U.S. Capital's note program.  The three partners and Levy went to West Palm Beach for lunch and Levy explained the program and gave them sales brochures.  The partners contacted Schwartz and set up a meeting at FCS, which Levy attended, in an effort to perform due diligence.  RHC wound up putting a number of investors into the program, many of whom lost a significant amount of money.

In March 1999, broker Gary Fox met with Schwartz and Levy to discuss the notes program; they ate lunch at Nick's Italian Fishery, which they indicated they owned.

In late 1998, Schwartz asked Lee Summers, FCS's attorney, to form Florida Restaurant Management. Summers testified that FCS, Schwartz (through his company First Consolidated), Levy, and Nick's maitre d' Alex all loaned money to Florida Restaurant Management for the purchase of Nick's Italian Fishery. Gary Fox, U.S. Capital's exclusive broker in West Virginia, testified that he had lunch with Levy and Schwartz at Nick's in March 1999, and they indicated that they owned the restaurant. Stephen Kelley, who in 2001 prepared FCS's back taxes for the years 1996-2000, testified that FCS loaned Nick's a total of $1,027,062.

Zendell Katz testified that Levy and Schwartz co-owned various property besides Nick's, including airplanes and helicopters. Alan Goldberg, FCS's bankruptcy trustee, testified that FCS loaned $2.7 million to Southwest Florida Aviation for the purchase of a helicopter, although he did not say whether Schwartz or Levy owned an interest in that helicopter.

Sometime before September 1999, Levy's attorney, Jeffrey Paine, sent a draft security agreement to FCS. The agreement stipulated that FCS would use U.S. Capital money only for factoring accounts receivable. Nikki Nedbor, FCS's attorney at the time, advised Schwartz that FCS could not truthfully execute the agreement without substantial revision; Schwartz agreed. After Nedbor relayed FCS's position to Paine, he set up a lunch meeting to discuss the issue. Schwartz,

Nedbor, Levy, and Paine ate at Nick's sometime before September. According to Nedbor, the issue of how FCS was using investor funds was not broached at lunch and neither Levy nor Paine ever mentioned it again. FCS continued to make asset based loans until sometime in September.

Lawrence Nunez, U.S. Capital's data-entry guy, called FCS twice in late 1999 because investors were calling U.S. Capital, inquiring about their money. The first time Schwartz stated "I've dealt with it with Ray [Levy]," and the second time he told Nunez to mind his own business.

d. FCS's lack of insurance.

FCS did not adequately insure the accounts receivable it bought. There was a $2 million annual limit on its Continental Insurance policy. On January 27, 1999, Nicholas Diacou, of Continental's Chicago office, sent U.S. Capital a letter titled "Unauthorized use of Continental Insurance Company's name and unauthorized reference to CNA/Continental Insurance Group in promotional brochures." The letter states:

> Gentlemen: It recently came to our attention that U.S. Capital . . . without our consent, is using Continental Insurance Company's name and referring to CNA/Continental Insurance Group in brochures used do [sic] solicit investors for financing instruments, so-called capital notes, offered by U.S. Capital.
> . . . .
> We have concerns about the use of our name in the brochures. We

have received calls and inquiries about the promotional brochures. Someone may contend that, because our name is mentioned in the brochure, CIC or the CNA/Continental Insurance Group guarantees investments in the capital notes or is otherwise associated with them. As you know, CIC does not guarantee such investments and has no association with the capital notes. Furthermore, CIC has no association with First Capital other than to act as its accounts receivable credit insurer under Policy Number N49130. CIC has no association whatsoever with U.S. Capital.

. . . .

U.S. Capital's use of Continental Insurance Company's name and reference to CNA/Continental Insurance Group in the brochure or in any of its advertising, sales, promotional or solicitation materials is unauthorized and illegal.

You are hereby instructed to stop such activity immediately and to refrain from doing so in the future. This instruction also applies to your affiliated companies and any entity with which you have a contractual relationship.

Throughout the alleged conspiracies, a number of investors and independent brokers contacted Continental Insurance to discover what sort of insurance FCS carried on the accounts receivable. By contrast, Levy presented no evidence that he inquired into the nature and coverage of FCS's insurance policy before Continental's demand letter to U.S. Capital.[76] Further, Levy presented no direct or

---

[76] Levy did, however, receive a letter from FCS dated April 9, 1999, which stated: This will confirm prior conversations with Larry Schwartz regarding the status of credit insurance on accounts receivable factored by First Capital. As you are aware, CNA has refused to renew its insurance policy with FCS as a result of the telephone calls it received from the Secretary of State and numerous potential investors. CNA is aware that certain brokers have made representations to investors regarding the insurance carried by FCS in connection with the factored accounts receivable and that brochures using CNA's name have been disseminated by your compnay to brokers and to investors. FCS is extremely

circumstantial evidence suggesting that Schwartz positively deceived him regarding the nature of FCS's insurance or FCS's use of U.S. Capital's funds. There was no evidence that U.S. Capital ever stopped using a brochure listing Continental as an insurer to sell notes.

e.  U.S. Capital's use of investor funds.

Korinne Harper, a Government investigator, testified that in 1998 U.S. Capital transferred about $1.2 million in investor funds to American Benefits Services, Levy's viatical brokerage company, and also invested investor funds in Invoice Funding, another factoring company.  From May to June of 1999, U.S. Capital spent over $4 million worth of senior note holders' money on promissory notes issued by factoring firms like Sun Capital, Incorporated, and Merchants Capital, instead of FCS.  Those firm's accounts receivable were not insured by Continental, per the senior capital notes sales brochures.

In May or June 1999, the Department issued a subpoena for U.S. Capital's corporate records regarding the sale of senior capital notes and purchase of

disappointed that it has lost its credit insurance coverage with CNA.  FCS has established a verbal confirmation from American Credit Indemnity to replace that insurance.  The name of the insurance company is not to be disclosed to any employees, brokers, agents, investors or anyone else for any purpose whatsoever. And under no circumstances are any of your employees, agents or brokers which you utilize to make any representations to investors regarding credit insurance on accounts receivable.

corporate funding notes. July 19, 1999 was the last date on which U.S. Capital purchased a six-month corporate note from FCS.

The Government presented direct evidence in the form of summaries of bank account activity showing that U.S. Capital commingled investor funds with its own profits and paid commissions out of the pool of investor funds. Several witnesses testified that, starting in 1999, U.S. Capital did not forward all investor funds to FCS, but paid interest and satisfied liquidation requests out of its pool of investor funds and forwarded the remainder to FCS along with a "new business transmittal" indicating how much each investor had put into the capital note program. From February 19, 1998 to July 19, 1999, U.S. Capital purchased $22.9 million in FCS corporate notes. From January 16, 1998 to September 1999, it received only $7.25 in return from FCS. Korinne Harper, a Government investigator, testified that "[i]f you look at the entire life of the [U.S. Capital] account, there wasn't enough money received or earned in prepaid interest or any other way from factoring companies to pay the expenses in interest, commissions, and other business expenses of U.S. Capital."

Numerous investors and brokers testified that, toward the end of the alleged fraud scheme, they wrote U.S. Capital to liquidate their notes, with no response – or a negative response – from U.S. Capital. When Alan Goldberg was going

through FCS's credits and debts as its liquidation trustee in 2000, he discovered that many of U.S. Capital's loans to FCS were not secured because U.S. Capital had either not filed its UCC-1 forms or filed them incorrectly.

2.

An agreement to conspire may "be proved by circumstantial as well as direct evidence," United States v. Hernandez, 921 F.2d 1569, 1575 (11th Cir. 1991), and may be inferred from the relationship of the parties, their overt acts and concert of action, and the totality of their conduct. United States v. Guerra, 293 F.3d 1279, 1285 (11th Cir. 2002).[77]

We think a reasonable jury could have concluded the following. (1) Levy formed U.S. Capital to help Schwartz and FCS evade a Government inquiry into the legality of the note program. (2) Levy joined Schwartz in pitching the note program – by brochures, advertisements, and personal assurances – as being directed strictly for the sale of insured corporate and government receivables, that investors' funds would be segregated, and that U.S. Capital's notes would be backed by UCC-1 filings securing its interest in the accounts

---

[77] We review the evidence against Levy and then Orlick de novo, considering the evidence in the light most favorable to the Government and construing all reasonable factual inferences – including inferences about the credibility of witnesses – to be consistent with the jury's verdict. See United States v. Smith, 459 F.3d 1276, 1286 (11th Cir. 2006).

receivable purchased by FCS.  (3) Levy was on notice that at least some investors were concerned about the validity of those representations, as demonstrated by James Hurd's suggestions that investors' funds be segregated in a bonded trust account.

(4) Levy knew about FCS's loans because he personally benefited from them.  He and Schwartz bought Nick's in part with money provided by FCS and FCS made loans in excess of $1 million to Nick's while he was co-owner.  The jury could have also inferred that he co-owned a helicopter with Schwartz bought with money loaned by FCS.

(5) Levy knew FCS's receivables were underinsured.  U.S. Capital forwarded over $20 million to FCS in the course of three years; the jury could have reasonably inferred that Levy, based on such an investment, had done his homework regarding the insurance that protected it.  His ignorance, if any, was dispelled by Continental's January 1999 demand letter.  After that, U.S. Capital voluntarily continued to use the old brochures naming Continental and CNA insurance to sell notes and continued its business with FCS through the summer of 1999.

(6) Levy knew U.S. Capital was misusing investor funds and directed it to do so.  The jury could have inferred that Levy, as the owner and director of U.S.

65

Capital, knew that U.S. Capital was not segregating investor funds from U.S. Capital profits and the commission due independent brokers. Additionally, in 1998, U.S. Capital made loans using investor funds to Levy's company American Benefits and used investor funds to buy promissory notes of companies other than FCS, in violation of its promise in the sales brochures and on the face of the senior capital notes.

(7) The jury could have inferred that Levy knew FCS was losing money and that investor funds were therefore not truly liquid. As U.S. Capital's owner and director, he would have known about its so-called offset accounting technique of sending new investor funds – minus old interest, liquidation, and commission payments – to FCS. The jury could have inferred that Levy directed U.S. Capital to use the accounting technique to hide FCS's losses, and thereby forestall the day that investors' liquidation requests could not be met.

(8) As to Levy's conviction of conspiracy to commit money laundering, a reasonable jury could have inferred that U.S. Capital's offset accounting was a deliberate attempt by Levy and Schwartz to delay the inevitable day of reckoning by shielding FCS's indiscretions from investors: as long as new investor funds outpaced interest and liquidation payments, U.S. Capital and FCS could continue

to misuse investor funds without risk of discovery.[78] In that way, the conspirators "hid" the proceeds of their fraud scheme in some cases by actually paying their clients. In addition, U.S. Capital and FCS both made loans with investor funds to corporations owned and controlled by Schwartz and Levy, and wrote checks to outside entities – brokers, business partners, etc. – all to secret away the proceeds of their fraud.

## B. Orlick.

Orlick joined U.S. Capital sometime early in 1998. At first Orlick was directed by her father and trained by the outgoing office manager, Linda Lundgren. However, Levy told Zendell Katz, a sales broker, that "[Orlick] was going to run things and [Levy] was going to show her how to do it."

By the middle of 1998, Orlick managed U.S. Capital's office day-to-day. Independent brokerage agents who worked on-site at U.S. Capital, like Richard Porcelli, were told to bring their paperwork and questions to Orlick, who signed their commission checks. According to Porcelli, Orlick collected paperwork from

---

[78] Several witnesses testified that U.S. Capital's offset accounting amounted to a Ponzi scheme. We note that it differed from a classic Ponzi scheme – in which old investors are paid with new investors' funds – in that FCS issued corporate notes to U.S. Capital totaling the same amount that U.S. Capital had received from investors. At least on the books, U.S. Capital had forwarded enough money to FCS to represent adequately the amount investors had loaned to U.S. Capital. The offset accounting, however, allowed FCS to lose the money while U.S. Capital continued to pay off investors.

agents, paid agents' commission, issued paperwork to investors, and wrote monthly checks to investors. She signed many of the U.S. Capital senior capital notes. When Levy was out of the office, Orlick was in charge. She hired at least one employee, Kelly Crowning, who testified that Levy was in the office only "[o]nce in a while."[79]

Orlick also managed U.S. Capital's operating account, into which investor funds were deposited and out of which FCS corporate funding notes were purchased and investors and brokers were paid. She reviewed the work of Lawrence Nunez, who was responsible for updating U.S. Capital's electronic accounting records when new investors sent in their checks and paid liquidations. According to Nunez, Orlick knew that U.S. Capital was not sending all of the new investors' money to FCS, but deducting the amount paid in commissions and interest.

Over the course of the conspiracy, Orlick signed checks to FCS for $22 million in investor money. Starting in July 1999, FCS began to default on its obligations to U.S. Capital. Orlick kept sending investor funds to FCS, but paid liquidation requests out of the money coming in from new investors because

---

[79] Crowning was a secretary from approximately 1998 to 2000 for American Benefits, which was run out of the same office as U.S. Capital.

money from FCS was not forthcoming. By the end of the notes program, FCS had returned only $7 million to U.S. Capital.

At some point in 1999, U.S. Capital made it more difficult for investors to liquidate their notes. Orlick implemented the change. Several brokers and investors testified that, after mid-1999, their liquidation requests were denied. Jay Long, an investor, testified that when he called about his investment in September 1999, Orlick told him that U.S. Capital was having administration problems.

We think a reasonable jury could have found that Orlick, from her position at U.S. Capital, knew about and voluntarily participated in the scheme to defraud individual investors through the senior capital notes program. She signed the notes and accompanying literature representing that investors' funds would be segregated, liquid, and used only to invest in FCS, for government or insured corporate receivables. She knew that U.S. Capital did not segregate investor funds from U.S. Capital's corporate funds, and the jury could have inferred from her formal position, her management of the office, her oversight of U.S. Capital's account, and her responsibility for signing checks out of U.S. Capital's checking accounts that she consorted with her father to dictate how investor funds were used. Even if Orlick did not know how FCS was using funds, her knowledge of U.S. Capital's misuse coupled with a tacit agreement with Levy to misuse those

69

funds linked her to the larger conspiracy because Levy knew about FCS's misuse of funds.

We think, though, that a reasonable jury could have concluded, based on Orlick's position and activities at U.S. Capital and her personal relationship to her father, Raphael Levy, who benefited from several FCS loans, that she knew and voluntarily participated in how FCS misused investor funds as well. The jury could have inferred that she must have investigated the nature of FCS's activities because she personally represented that investor funds would be used in a certain way. The jury could have found from U.S. Capital's decision to begin satisfying interest and liquidation payments out of new investors' funds that Orlick knew about and helped direct U.S. Capital to delay investor scrutiny by keeping up the appearances of success while FCS was losing money.

V.

We AFFIRM the court's judgment in all respects except as to Schwartz's convictions, which we VACATE.

SO ORDERED.